**SEALED DOCUMENTS**

<u>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR ISSUANCE OF ARREST WARRANTS**</u>

FILED

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

2:12mj469

I, Brian R. Lewis, being duly sworn and deposed, state the following:

<u>**INTRODUCTION**</u>

1. I am a Special Agent (S/A) for Homeland Security Investigations (HSI) within the United States Department of Homeland Security, and am currently investigating a drug trafficking organization (DTO) engaged in a conspiracy to import and distribute 3,4- Methylenedioxy-N-methcathinone (Methylone), a Schedule I Controlled Substance, into the United States, and to distribute and possess with intent to distribute Methylone in the Eastern District of Virginia, and elsewhere.

2. I make this affidavit in support of a criminal complaint and arrest warrants for: **Timothy Sean MOORE JR., Caroline Elizabeth TAYLOR, and Angelia WALKE.**

<u>**CRIMINAL OFFENSE**</u>

3. This request for a criminal complaint and arrest warrant is made in relation to the following offenses occurring in the Eastern District of Virginia and elsewhere:

Conspiracy to Import Methylone, a Schedule I Controlled Substance in violation of Title 21 §§ U.S.C. 952 and 963.

<u>**EXPERIENCE AND TRAINING OF AFFIANT**</u>

4. I am a Special Agent (S/A) for Homeland Security Investigations (HSI) within the United States Department of Homeland Security, and have been so employed since 2009. I am presently assigned to the Hampton Roads Border Enforcement Security Task Force (HR-BEST), a multi-agency collaborative effort designed to identify, disrupt, and dismantle organizations that engage in transnational criminal activity with a primary focus on narcotics smuggling, and have been so employed since May 2009. Prior to being employed with HSI, I was employed as both

an Immigration Enforcement Agent and as a Deportation Officer for U.S. Immigration and Customs Enforcement (ICE) for approximately four years. As this affidavit is being submitted only for the limited purpose of obtaining a criminal complaint, I have not included each and every fact known to the investigative team concerning this investigation. Rather, I have set forth only those facts that are believed to be necessary to establish probable cause for the charges stated below.

5.  I make this affidavit in support of an application for a criminal complaint for the following individuals: **Timothy Sean MOORE JR., Caroline Elizabeth TAYLOR, and Angelia WALKE.**

## FACTS AND CIRCUMSTANCES

6.  Since October 2012, I have been investigating the suspected importation of 3,4-Methylenedioxy-N-methcathinone (Methylone), a Schedule I controlled substance, into the United States from China by Timothy Sean MOORE JR, Caroline Elizabeth TAYLOR, and Angelia WALKE hereinafter respectively referred to as MOORE, TAYLOR, and WALKE. MOORE was initially identified during the course of another synthetic drug importation investigation conducted by your affiant.

7.  On October 9, 2012, I received information from a cooperating defendant (CD#1). CD#1 had been stopped by law enforcement on October 7, 2012, in North Carolina and found with a firearm and Methylone, a Schedule I controlled substance. CD#1 voluntarily travelled to the Portsmouth Police Department – Special Operations Unit office. He was told that he was not required to be at the location and did not need to be interviewed. CD#1 voluntarily provided information against his own interests in the subsequent interview.

8.  CD#1 stated that he has known Timothy MOORE for approximately two years. CD#1 further stated he has previously sold multiple pounds of high grade marijuana, and in some cases, MOORE would buy and/or sell marijuana to CD#1. CD#1 stated that MOORE began buying methylone from a laboratory in China approximately 1-2 months ago (August-September 2012). CD#1 stated that MOORE told CD#1 that he acquired an email address for a laboratory in China that sold Methylone, and that he would wire money to China to facilitate the purchases. CD#1

2

stated that Caroline TAYLOR (MOORE's girlfriend) talked MOORE into beginning methylone importation and distribution, and that both MOORE and TAYLOR would distribute methylone upon its arrival from China. CD#1 further stated that as MOORE rarely drove, TAYLOR would drive when deliveries of methylone were made. CD#1 stated that on one prior occasion, he saw an international parcel at MOORE's residence that MOORE identified as the packaging in which methylone arrived from China. MOORE told CD#1 that he "got it off the internet." CD#1 stated that he knew MOORE had received two shipments of Methylone from China, the first being two to four kilograms, and the most recent being five and six kilograms. According to CD#1, MOORE would sell each kilogram of Methylone for $10,000-$12,000. CD#1 stated that he purchased four ounces of methylone from MOORE on MOORE's first shipment, and that on a date near October 3, 2012, he purchased one kilogram of Methylone from MOORE for $11,200. CD#1 paid MOORE $5,600 upfront with the agreement that he would return the remaining $5,600 upon selling the Methylone. CD#1 stated that he sold varying quantities of Methylone to three individuals in the first few days upon receiving it from MOORE, and was planning to deliver four ounces on the night of October 7, 2012 when he and another person were stopped in North Carolina. CD#1 then admitted that he facilitated the North Carolina deal for the distribution of Methylone.

9. At approximately 2300hrs on October 9, 2012, while monitored by law enforcement, CD#1 sent MOORE a text message asking when he could come to MOORE's residence. According to CD#1, it was implied that CD#1 would be conducting a Methylone transaction upon his arrival to MOORE's residence on Oregon Avenue in Portsmouth. MOORE responded that CD#1 could come at that time. A surveillance team was stationed within viewing distance of MOORE's residence, and CD#1 departed the PPD-SIU office in his vehicle to travel there. Prior to his departure, CD#1's vehicle and his person were consensually searched for the presence of contraband with negative results. After arriving at MOORE's residence, CD#1 stayed inside for approximately twenty minutes. After departing MOORE's residence, CD#1 met with HSI Special Agent Lewis and Detective Deluca in a nearby parking lot. CD#1 stated that MOORE gave CD#1 four ounces of Methylone and said "I'm all out, but I'll be good by this weekend." The four ounces of Methylone was seized by members of the investigative team.

10. On October 11, 2012, Portsmouth Police obtained a search warrant on the Oregon Avenue address based on the information received from CD#1 and the controlled purchase of

3

Methylone CD#1 had completed on October 9, 2012.

11. Through information garnered from an email search warrant conducted in a related Methylone importation investigation, I identified an address in the 3000 block of Augustine Circle, Portsmouth, Virginia as the location receiving packages of Methylone from an identified synthetic drug laboratory based in China. The Augustine Circle address was used as a shipping destination for two separate email accounts (Mirandabailey@hushmail.com and rogerrabbit7777@gmail.com). In addition to listing the Augustine Circle address as a final destination, both email addresses list an individual J.E. as the recipient of packages of synthetic drugs shipped from the laboratory.

12. Investigative research yielded information that although J.E. previously lived at this address, he was incarcerated on unrelated state narcotics charges on at least one date when a package of synthetic drugs was shipped to this address. Additionally, research conducted in conjunction with the United States Postal Inspection Service revealed that the name "J. Edwards" was used when signing for various packages of synthetic drugs delivered from China.

13. Further information revealed that Angelia WALKE was a current resident of the Augustine Circle address. WALKE was identified by a letter carrier employed by the United States Postal Service as having received and having signed for multiple packages originating China. According to the letter carrier, WALKE stated that she was an acquaintance of J.E., and was accepting mail on his behalf.

14. Both the Augustine Circle address and WALKE were identified as being connected to Timothy Sean MOORE Jr. WALKE was identified as a relative of a female acquaintance of MOORE's. Also, MOORE listed the Augustine Circle residence as his address in several unrelated police reports. Knowing that MOORE had ordered additional Methylone, pursuant to his statements from CD#1, officers awaited information from the United States Postal Inspection Service (USPIS) that parcels from China destined for the Augustine Circle address had been intercepted before executing the search warrant at the Oregon Avenue location

15. On the afternoon of October 24, 2012, I received information from a United States Postal Inspection Service (USPIS) inspector that two packages originating from China were delivered to the Augustine Circle address bearing a recipient name of J.E. on the morning of October 24,

2012. Further, the inspector relayed that Angelia WALKE signed for and accepted both packages. A review of the shipping labels affixed to both packages revealed that the particulars of the shipping label were consistent with those of packages identified in previous synthetic drug investigations conducted by Special Agent Lewis. In particular, the postal code of the shipper, '210029', the origin office '3-5', and the description of the contents as "zeolite", matched previous shipments of synthetic drugs from the identified source laboratory in China. Additionally, the weights of the packages were consistent with previous synthetic drug shipments from China to Portsmouth, Virginia. Using this information, law enforcement secured a state search warrant for the Augustine Circle address.

16. On the evening of October 24, 2012, law enforcement officers executed the search warrants on Augustine Circle and Oregon Avenue locations. Upon making entry to Augustine Circle, HSI Special Agent Lewis encountered Angelia WALKE. WALKE was apprised of her Miranda rights and subsequently waived them in writing. During a subsequent interview, WALKE stated that she began to receive packages from China addressed to J.E. on behalf of Timothy MOORE during the summer of 2012. WALKE stated that MOORE asked her for permission to have packages sent to her home from China. WALKE further stated that MOORE asked her for the name of a previous resident of her address as MOORE didn't want to have packages sent in his own name, nor did he want to receive packages at his residence. WALKE stated that she provided MOORE with the name J.E. According to WALKE, she asked MOORE if the contents of the package were illegal to which MOORE replied, "No." WALKE then stated, "He said that he was ordering stuff from China and he had the tracking numbers, I didn't want to know more about it." WALKE then described receiving the first package and feeling the contents of the bag from the outside. WALKE described the contents as "rocky, like bath salts." WALKE stated that she asked MOORE, "What is this, bath salts?" and that MOORE initially replied "Yeah, whatever." WALKE stated that "I knew that he had something in the packages that he was distributing." On a subsequent delivery, when MOORE arrived at WALKE's residence to retrieve the package, WALKE stated that she asked MOORE "What is this?" to which MOORE replied, "It's a new thing that people are doing, my friends are doing, like bath salts." WALKE then replied, "Like bath salts on the news?" WALKE stated that MOORE replied, "Yeah." Special Agent Lewis asked WALKE if she believed that the packages that she received from China on MOORE's behalf contained narcotics. WALKE replied, "Yes." Recovered from this residence were small quantities of cocaine and heroin. Digital scales and

gelatin capsules were also recovered. Subsequent to this interview, Special Agent Lewis went to the Oregon Avenue address, the primary residence of MOORE.

17. At the Oregon Avenue address, law enforcement officers recovered these and additional items: over $3,000 U.S. currency; a quantity of marijuana; approximately 1.6 kilograms of Methylone (located in MOORE and TAYLOR's bedroom); two digital scales with narcotics residue; a Rubbermaid bowl with narcotics residue; a glass smoking device; three additional digital scales with mailing or packaging material addressed to TAYLOR; a Dell laptop; empty gel capsules used for packaging Methylone; a stainless steel mini butcher knife with narcotics residue; personal paperwork belonging to MOORE, TAYLOR and another individual; two Apple iPhones; a Toshiba computer tablet; USPS package containing a box of syringes; three smoking devices with narcotics residue; packaging materials; Toshiba laptop computer; and an Apple MacBook. Two firearms were also located in a bedroom in the house and were identified as belonging to one of the occupants of the house.

18. Upon arriving at the Oregon Avenue address, I encountered Timothy Sean MOORE Jr. MOORE was apprised of his Miranda rights and subsequently waived them in writing. During the subsequent interview, MOORE initially stated that he created the Mirandabailey@hushmail.com email account during August 2012. When asked for the password to this account, MOORE stated that he did not know it, and then stated that his girlfriend, Caroline TAYLOR, created the Mirandabailey@hushmail.com account. When questioned by Special Agent Lewis as to the significance of the name "Miranda Bailey," MOORE stated that TAYLOR was a fan of the television show "Grey's Anatomy," and that the character "Miranda Bailey" was the one whom TAYLOR most closely identified as she was "the sassy one."

19. MOORE stated that a mutual friend of his and TAYLOR's provided them both with the email address of a laboratory in China where they could order methylone and other synthetic drugs. MOORE further stated that he ordered the two separate one (1) kilogram packages of methylone that he received earlier in the day approximately three weeks prior, paying approximately $1,600 per kilogram. MOORE stated that the typical sequence of events to place and receive an order of methylone from the laboratory in China was as follows:

20.

   a. MOORE would provide cash to Caroline TAYLOR for TAYLOR to place an order of methylone with the laboratory in China.

   b. TAYLOR would facilitate both the communications with the laboratory and the transfer of funds to the laboratory in China on most occasions. On other occasions, MOORE would directly communicate with the laboratory about synthetic drugs.

   c. TAYLOR and/or MOORE would become aware of the tracking number associated with the package of synthetic drugs being shipped from China via an email from the Chinese laboratory.

   d. TAYLOR and/or MOORE would travel to Angelia WALKE's residence to retrieve the package(s) of synthetic drugs that WALKE signed for in the alternate name.

   e. TAYLOR and/or MOORE would travel back to Oregon Avenue to begin processing the synthetic drugs for distribution to wholesale customers.

21.   MOORE stated that he and TAYLOR completed approximately three orders of Methylone totaling approximately six kilograms. MOORE further stated that TAYLOR retrieved the first two packages of methylone from WALKE, and that he received the package delivered on October 24, 2012. MOORE went on to say that he provided TAYLOR with approximately $7,000-$8,000 to facilitate these three orders.

22.   MOORE stated that he would sell kilograms of Methylone to CD#1 for a price between $8,700 and $10,000 each depending on the quantity purchased by CD#1, and that CD#1 generally paid upfront when receiving Methylone from MOORE.

23.   When I challenged MOORE about using rogerrabbit7777@gmail.com to place synthetic drug orders, MOORE vehemently denied this, but stated that this account was, in fact, his own. MOORE stated that TAYLOR had hacked his computer and was using his email accounts, bank





codes and cell phone information. He indicated that TAYLOR was into the synthetic drug "scene" before they started dating in October 2011.

24. Subsequent to the interview of MOORE, your affiant interviewed Caroline TAYLOR. TAYLOR was apprised of her Miranda rights and subsequently waived them in writing. TAYLOR denied all involvement in the synthetic drug trade. TAYLOR stated she knew MOORE had talked about beginning to import and distribute Methylone, but that she was not aware that he actually began to do so.

25. TAYLOR, among other things, admitted that the Apple MacBook recovered from the Oregon Avenue address was hers. A forensic imaging of the MacBook found documents associated with the mirandabailey@hushmail.com email address. Further, a screen shot of tracking information for EMS (Express Mail Service), an international parcel delivery provider, was located on TAYLOR's MacBook for the Methylone received by WALKE on October 24, 2012.

26. I challenged TAYLOR regarding the mirandabailey@hushmail.com account and her interest in the television show "Grey's Anatomy." TAYLOR's face became flush, and she stated that she did not like the character "Miranda Bailey," but prefers another character. TAYLOR was unable to provide any explanation as to why MOORE would have created an email address with the name "Miranda Bailey" even though he was not a fan of "Grey's Anatomy". When questioned as to which computers belonged to her, TAYLOR stated, "Both of the Apples, I don't do Windows. I leave that for Tim (MOORE)." I then asked TAYLOR whether MOORE ever used her computers. TAYLOR stated, "I don't think so, but maybe he did." I then asked TAYLOR if there would be any evidence of mirandabailey@hushmail.com or rogerrabbit7777@gmail.com emails on her computer. TAYLOR's face again became flush, and she replied, "Well, he probably did use my computers then." TAYLOR then added that both of the email accounts belonged to MOORE, and that she has never accessed them. I began to engage TAYLOR in conversation regarding Methylone and other synthetic drugs. TAYLOR displayed a level of knowledge unusual to individuals outside of the synthetic drug "scene.". TAYLOR began to discuss the chemical composition of Methylone, its chemical similarity to that of MDMA, and began to discuss the Federal Analog Act. I challenged the origin of TAYLOR's intimate knowledge of synthetic drugs to which she replied, "I'm a biochem major." I told TAYLOR that it was highly unlikely that the chemical structure of Methylone and its

8

analog relation to MDMA would be discussed in a biochemistry class. When challenged as to where she was studying biochemistry, TAYLOR relented and stated, "Well, I took like one year at Penn State." TAYLOR then admitted to being a part-time student at Tidewater Community College (TCC). I asked TAYLOR if TCC had a biochemistry program, and she stated, "Well, I'm just doing general education studies there." I told TAYLOR that she was lying. TAYLOR became visibly flustered, throwing her hands up, shifting her body in the seat, and stated, "I don't have anything to do with drugs; this is all Tim's fault." TAYLOR then began to cry. TAYLOR refused to admit her role in the importation, possession, and or distribution of Methylone and any other synthetic drugs.

27. On November 16, 2012, a confidential source (CS#1) provided additional information regarding TAYLOR. CS#1 stated that TAYLOR had approached him/her in December 2011 to wire several thousand dollars to a laboratory in China to "help with Methylone coming in." TAYLOR provided CS#1 the bank information for the laboratory from an email printout TAYLOR had in her possession. CS#1 said both MOORE and TAYLOR drove him/her to the bank so he/she could complete the bank wire. However, there was a problem with the transfer. CS#1 was able to withdraw the funds which he/she returned to TAYLOR. A check of CS#1 bank records showed that CS#1 had attempted a bank transfer to a Chinese bank in December 2011. CS#1 further stated that MOORE and TAYLOR explained to him/her that Methylone was a "research chemical." CS#1 was aware of at least one delivery of Methylone to MOORE and TAYLOR in early 2012. TAYLOR indicate to CS#1 that MOORE and TAYLOR were having the Methylone shipped to an older woman in Churchland. A description of WALKE was provided and CS#1 stated, "That's gotta be her," referring to the older woman in Churchland. Further, CS#1 stated that MOORE used to live with that same woman, WALKE, which was confirmed by case agents.

28. In a subsequent search of TAYLOR's vehicle, pursuant to the search warrant, several envelopes containing bank statements were retrieved. In reviewing these records, two wire transfers to Kangshuo Biotech's account at the Shenzen Development Bank in China were discovered. Kangshuo Biotech is the laboratory that was contacted by MOORE and TAYLOR, and the same laboratory responsible for shipping packages of Methylone to MOORE from China. A review of email traffic between mirandabailey@hushmail.com and Kangshuo Biotech shows that the bank wires correspond to orders of Methylone placed by MOORE and TAYLOR.



## CONCLUSION

29. Based on the foregoing, your affiant submits that there is probable cause to believe that Timothy Sean MOORE JR., Caroline Elizabeth TAYLOR, and Angelia WALKE did knowingly and intentionally conspire to distribute or possess with the intent to distribute 3,4-Methylenedioxy-N-methycathinone (Methylone), a Schedule I controlled substance, and did knowingly and intentionally conspire to import into the United States from any place outside thereof, 3,4-Methylenedioxy-N-methycathinone (Methylone), a Schedule I controlled substance.

Brian R. Lewis
Special Agent
Homeland Security Investigations

Read and Approved:

Amy Cross
Special Assistant United States Attorney

Sworn and subscribed to before me
On this __28__ day of November 2012

United States Magistrate Judge
Norfolk, Virginia