FILED
IN OPEN COURT

APR 4 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:12cr196 |
| | ) | |
| TIMOTHY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Criminal Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1. Since October 2012, agents from the Hampton Roads Border Enforcement Security Taskforce (HR-BEST), a division of the Department of Homeland Security, have been investigating the suspected importation of 3,4- Methylenedioxy-N-methcathinone (Methylone), a Schedule I controlled substance, into the United States from China by Timothy Sean MOORE JR, Caroline Elizabeth TAYLOR, and Angelia WALKE hereinafter respectively referred to as MOORE, TAYLOR, and WALKE.

2. After a cooperating co-defendant Brett WALSH was stopped in North Carolina with a quantity of Methylone and a firearm, WALSH told officers that his source of supply for the Methylone were Defendants TAYLOR and MOORE. WALSH further stated that MOORE began buying Methylone from a laboratory in China approximately in the fall of 2012. MOORE told WALSH that he acquired an email address for a laboratory in China which sold Methylone, and that he would wire money to China to facilitate the purchases. Caroline TAYLOR

1




(MOORE's girlfriend) talked MOORE into beginning Methylone importation and distribution. Both MOORE and TAYLOR would distribute Methylone upon its arrival from China. According to WALSH, MOORE rarely drove so TAYLOR would drive when deliveries of Methylone were made.

3. On one prior occasion, WALSH saw an international parcel at MOORE's residence that MOORE identified as the packaging in which Methylone arrived from China. MOORE told WALSH that he "got it off the internet." WALSH stated that MOORE had received two shipments of Methylone from China. The first shipment was for between two and four kilograms, and the second was for between five and six kilograms. MOORE sold each kilogram of Methylone for $10,000 to $12,000. WALSH stated that he purchased four ounces of Methylone from MOORE on MOORE's first shipment, and that on a date near October 3, 2012, he purchased one kilogram of Methylone from MOORE for $11,200. WALSH paid MOORE $5,600 upfront with the agreement that he would return the remaining $5,600 upon selling the Methylone. WALSH purchased the Methylone to redistribute.

4. On October 9, 2012, while monitored by law enforcement, WALSH sent MOORE a text message asking when he could come to MOORE's residence to conduct a Methylone transaction. MOORE responded that WALSH could come at that time. A surveillance team was stationed within viewing-distance of MOORE's residence. Prior to his departure, WALSH's vehicle and his person were consensually searched for the presence of contraband with negative results. After arriving at MOORE's residence, WALSH stayed inside for approximately twenty minutes. After departing MOORE's residence, WALSH met with law enforcement officers in a nearby parking lot. WALSH stated that MOORE gave WALSH four ounces of Methylone and said



"I'm all out, but I'll be good by this weekend." The four ounces of Methylone was seized by members of the investigative team. TAYLOR was present for this transaction.

5. Through information garnered from an email search warrant conducted in a related Methylone importation investigation, law enforcement officers identified an address on Augustine Circle, Portsmouth, Virginia as an address receiving packages of Methylone from an identified synthetic drug laboratory based in China. The Augustine Circle address was used as a shipping destination for two separate email accounts (mirandabailey@hushmail.com and rogerrabbit7777@gmail.com), both connected with MOORE and TAYLOR. In addition to listing the Augustine Circle address as a final destination, both email addresses list "J.E." as the recipient of packages of synthetic drugs shipped from the laboratory.

6. Based on the investigation, officers came into contact with co-defendant Angelia WALKE, a resident of the Augustine Circle address. WALKE was identified by a letter carrier employed by the United States Postal Service as having received and having signed for multiple packages originating China. According to the letter carrier, WALKE stated that she was an acquaintance of "J.E.", and was accepting mail on his behalf.

7. On the afternoon of October 24, 2012, the United States Postal Inspection Service (USPIS) notified law enforcement officers that two packages originating from China were delivered to the Augustine Circle address bearing a recipient name of "J.E." on the morning of October 24, 2012. WALKE had signed for and accepted both packages. A review of the shipping labels affixed to both packages revealed that the particulars of the shipping label were consistent with those of packages identified in previous synthetic drug investigations conducted by agents.

3

8. On October 24, 2012, law enforcement officers made contact with WALKE. WALKE was apprised of her Miranda rights and subsequently waived them in writing. During a subsequent interview, WALKE stated that she began to receive packages from China addressed to "J.E." on behalf of Timothy MOORE during the summer of 2012. WALKE stated that MOORE asked her for permission to have packages sent to her home from China. WALKE further stated that MOORE asked her for the name of a previous resident of her address as MOORE didn't want to have packages sent in his own name, nor did he want to receive packages at his residence. WALKE stated that she provided MOORE with the name "J.E." According to WALKE, she asked MOORE if the contents of the package were illegal to which MOORE replied, "No." WALKE then stated, "He said that he was ordering stuff from China and he had the tracking numbers, I didn't want to know more about it." WALKE then described receiving the first package and feeling the contents of the bag from the outside. WALKE described the contents as "rocky, like bath salts." WALKE stated that she asked MOORE, "What is this, bath salts?" and that MOORE initially replied, "Yeah, whatever." WALKE admitted that "I knew that he had something in the packages that he was distributing." On a subsequent delivery, when MOORE arrived at WALKE's residence to retrieve the package, WALKE stated that she asked MOORE, "What is this?" to which MOORE replied, "It's a new thing that people are doing, my friends are doing, like bath salts." WALKE then replied, "Like bath salts on the news?" WALKE stated that MOORE replied, "Yeah." WALKE admitted that she believed that the packages that she received from China on MOORE's behalf contained narcotics.

9.   On the same date, October 24, 2012, law enforcement officers executed a search warrant on the residence of MOORE and TAYLOR, on Oregon Avenue in Portsmouth, Virginia. MOORE and TAYLOR were both in the location at the time of the search warrant. Officers recovered $1,765 United States Currency, scales, multiple computers and other electronic devices, approximately 4.5 grams of suspected marijuana, and 1,771.5 grams of 3,4-Methylenedioxymethicathinone (MDMC) Hydrochloride, also known as Methylone, a Schedule I controlled substance. The Methylone was recovered from the shared bedroom of MOORE and TAYLOR, inside a red Kohl's bag.[1]

10.  While at the Oregon Street, MOORE was apprised of his legal rights and waived them. He admitted that he and his girlfriend TAYLOR had created an email account, mirandabailey@hushmail.com. MOORE could not provide the password for the web-address, stating that TAYLOR had, in fact, created and maintained the address. MOORE stated that he and TAYLOR had been provided with the email address of a laboratory in China where they could purchase Methylone and other synthetic drugs. MOORE stated that he ordered the two (2) one-kilogram packages of Methylone that he had received earlier the same day approximately three weeks prior, paying $1,600 per kilogram. MOORE stated that typically when he ordered from China, the following would occur:

 a. MOORE would provide cash to Caroline TAYLOR for TAYLOR to place an order of Methylone with the laboratory in China.

 b. TAYLOR would facilitate both the communications with the laboratory and the

---

[1] The money was recovered from the following places: (a) $600 (twelve $50 bills) from MOORE's back jeans pocket; and (b) $1,165 (fifty-eight $20 bills, five $1 bills) from a bag in the bedroom closet belonging to TAYLOR. On November 1, 2012, an additional $15,000 U.S. Currency (One hundred and fifty $100 bills) was recovered from a relative of MOORE hidden inside a vacuum bag at a Portsmouth residence.

transfer of funds to the laboratory in China on most occasions. On other occasions, MOORE would directly communicate with the laboratory about synthetic drugs.

c. TAYLOR and MOORE would become aware of the tracking number associated with the package of synthetic drugs being shipped from China via an email from the Chinese laboratory.

d. TAYLOR and MOORE would travel to WALKE's residence to retrieve the package(s) of synthetic drugs that WALKE signed for in the alternate name.

e. TAYLOR and MOORE would travel back to Oregon Avenue to begin processing the synthetic drugs for distribution to wholesale customers.

10. MOORE stated that he and TAYLOR completed approximately three orders of Methylone totaling approximately six (6) kilograms. MOORE further stated that TAYLOR retrieved the first two packages of Methylone from WALKE, and that he received the package delivered on October 24, 2012. MOORE went on to say that he provided TAYLOR with approximately $7,000-$8,000 to facilitate these three orders.

11. According to MOORE, he made the following three orders:

   a. Order #1: 1/2 kilogram to 1 kilogram of Methylone; and

   b. Order #2: 2 kilograms of Methylone and 500 grams of 4-MEC; and

   c. Order #3: 2 kilogram of Methylone that MOORE picked up from WALKE.

12. In a search of TAYLOR's vehicle, pursuant to a search warrant, several envelopes containing bank statements were retrieved. In reviewing these records, two wire transfers, one for $1,700 and one for $4,400, to Kangshuo Biotech's account at the Shenzen Development

Bank in China were discovered. Kangshuo Biotech is the laboratory that was contacted by MOORE and TAYLOR, and the same laboratory responsible for shipping packages of Methylone to MOORE from China. A review of email traffic between mirandabailey@hushmail.com and Kangshuo Biotech shows that the bank wires correspond to orders of Methylone placed by MOORE and TAYLOR which were delivered to "J.E." at the Augustine Circle address.

13. A forensic search was completed of TAYLOR's MacBook computer, which she identified to police at the time of the search warrant. The computer only had one user set up for the machine, "Caroline." In a search of the computer, multiple files showed that the mirandabailey@hushmail.com had been accessed. Further, an imaging of the computer showed tracking of multiple EMS (Express Mail Service) packages, the shipping service used by the Chinese lab, including one delivered in late September, early October, 2012, consistent with the statements of WALSH.

14. According to a cooperating witness (CW#1), TAYLOR admitted that she and MOORE were importing Methylone from a laboratory in China and having it delivered to "an older woman's house" in Portsmouth. CW#1 stated that TAYLOR and MOORE knew the woman because MOORE used to live at the location, which was verified by law enforcement. Further, CW#1 stated that TAYLOR had called her on one occasion to show her a package she had just received. TAYLOR said, "We just got a package of Methylone in." The CW#1 did admit that she had attempted to wire money for TAYLOR to China to purchase Methylone using a credit union account. However, the transfer did not go through, and she returned the money to TAYLOR. On that occasion, MOORE and TAYLOR had driven CW#1 to the credit union to

conduct the wire transfer.

15. The acts of the defendant in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____
Amy E. Cross
Special Assistant United States Attorney

<u>Defendant's Signature:</u>   After consulting with my attorney and pursuant to the plea agreement entered into this day between myself, the United States and my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Timothy S. Moore, Jr.
Defendant

<u>Defense Counsel's Signature:</u>   I am Timothy S. Moore, Jr.'s attorney. I have carefully reviewed the above Statement of Facts with him. To the best of my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Peter Jankell
Counsel for the Defendant